UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOOTH AMERICAN COMPANY,

        Plaintiff,

                                            Civil Case No. 13-11391
v.                                       Honorable Linda V. Parker

BOSE MCKINNEY & EVANS, LLP,
and RONALD M. SOSKIN,

        Defendants.

_____/

## AMENDED OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

        This is a legal malpractice action arising from Defendants' representation of

Plaintiff Booth American Company ("BAC") in connection with the redemption of

certain BAC stock.  Presently before the Court is Defendants' motion for summary

judgment, filed pursuant to Federal Rule of Civil Procedure 56 on February 10,

2014.  The motion has been fully briefed.  The matter initially was assigned to the

Honorable Lawrence P. Zatkoff, but was reassigned to the undersigned on May 28,

2013 pursuant to Administrative Order 14-AO-030.  This Court held a hearing with

respect to Defendants' motion on July 23, 2014.  For the reasons that follow, the

Court denies Defendants' motion.

## I.      Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' "  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must
designate specifically the materials in the record supporting the assertion,
"including depositions, documents, electronically stored information, affidavits or
declarations, stipulations, admissions, interrogatory answers, or other materials."
Fed. R. Civ. P. 56(c)(1).  The court must accept as true the non-movant's evidence
and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*,
477 U.S. at 255.

## II.      Factual and Procedural Background

This legal malpractice action arises from Defendants' representation of BAC
in connection with the redemption of BAC stock owned by John L. Booth II and
certain trusts affiliated with him or members of his immediate family (hereafter
"JLB Owners").  Prior to the redemption, the stock of BAC was held equally by
two groups associated with two brothers: (1) Ralph H. Booth II ("Ralph") and
certain trusts affiliated with him and his family members, and (2) the JLB Owners.
(Compl. ¶ 5.)  In 2005, the JLB Owners expressed a desire to redeem their BAC
stock.  At the time of the request, BAC owed a liability to the Booth American
Company Defined Benefit Pension Plan ("Pension Plan") which was underfunded

by approximately $4.2 million.[1]  (*Id.* ¶¶ 6, 7.)  BAC was liable for the full amount of the underfunding.  (*Id.* ¶ 7.)

In August 2005, BAC engaged Defendant Ronald M. Soskin ("Defendant Soskin"), a partner with Defendant Bose, McKinney & Evans, LLP ("Defendant BME") (collectively "Defendants"), in connection with the redemption, specifically to negotiate and draft the necessary transaction documents.  (BAC's Resp., Ex. 8 at 14.)  The evidence reflects that the intent of the parties to the agreement was for BAC's assets and liabilities to be divided equally between BAC and the JLB Owners.  (*Id.*, Ex. 4, Ex. 9 at 67, 69, Ex. 10 at 57.)  There is no dispute here that from the start of the negotiations the JLB Owners agreed to assume fifty percent of the liability for the Pension Plan. (*See, e.g.* Defs.' Br. in Supp. of Mot. at Pg ID 105, Ex. A at 60-61; BAC's Resp. Ex. 8 at 56, 69, 102.)  The yet unresolved issue was whether the JLB Owners' share of the liability would be calculated in the

---

[1]The value of the Pension Plan fluctuated as the value of its assets increased or decreased.  (*See* Defs.' Mot. Ex. C at 66-68.)  If the assets grew sufficiently in value, the underfunded amount of the Pension Plan (BAC's liability) could disappear completely.  (*Id.*)  Conversely, if the value decreased, BAC's liability would increase.  (*Id.*)  As a result, when negotiating a redemption agreement, the parties did not know what the underfunded amount would be in the future.  (*Id.*)  The evidence reflects, however, that they expected the value to sufficiently increase– and the obligation therefore to decrease– within the next two or three years, making it possible to then settle and terminate the plan.  (*See, e.g.*, Soskin Dep. at 120; *see also* Defs.' Mot., Ex. W ¶ 14.)

-4-

net value of BAC at closing or would be paid at some future time.  (*Id*.; *see also* Defs.' Mot., Ex. C at 47-48.)

Due to the JLB Owners' "tax situation" and their inability to contribute fifty percent of the amount due the Pension Plan at the time of closing, the parties decided to enter into an indemnification agreement, in addition to the planned redemption agreement, which provided a mechanism for the JLB Owners to indemnify BAC for one-half of future payments BAC made to fund the pension plan.  (*Id*.; *see also* Defs.' Mot., Ex. C at 70-74; BAC's Resp., Ex. 12 (Defendants' memo to BAC and the JLB Owners' counsel stating that "[a] vehicle needs to be explored to enable John and the trusts to assume fifty percent (50%) of this contingent liability [funding of the Pension Plan] in the future; an escrow may be feasible.").)  The question then became how the indemnification agreement would be structured (e.g., whether the JLB Owners would place assets in escrow to cover the future payments, if so what those assets would be, and whether the agreement would continue perpetually or have an end date at which time the JLB Owners would be required to "settle up" on the remaining liability if the parties did not otherwise agree to extend the agreement or reach an alternative agreement).  (Pl.'s Resp., Exs. 9 at 68-69; 10 at 58-59, 62-63, 79; 12 ¶ 8; 13; 14.)

Defendants' initial draft of the Indemnification Agreement contained a

perpetual term.  (*See*, Defs.' Mot., Ex. F.)  Eventually a specific termination date of

December 31, 2011 was inserted.  There is an issue of fact as to whether Ralph

instructed Defendants to insert this termination date (as Defendant Soskin claimed

at his deposition, *see* Defs.' Mot., Ex. C at 98-99, 190-95) or whether the date was

requested by the JLB Owners (as BAC claims and as is testified to by Ralph and

BAC's Chief Financial Officer, Laura Petterle, at their depositions, *see* BAC's

Resp., Ex. 10 at 62-63; Ex. 9 at 76, 145).[2]  At some point an agreement regarding

the terms of the Redemption Agreement and Indemnification Agreement

(collectively the "transaction documents") was reached and the transaction

documents were executed in March 2006, and back-dated to January 2006.  (Defs.'

Mot., Exs. V, W.)

> The purpose of the Redemption Agreement is expressly stated to
>
> . . . cause Booth American to redeem the shares of common stock in
> Booth American owned by the JLB Owners (the "Redemption
> Shares") for an agreed redemption price and to provide for an
> indemnity by the JLB Owners of Booth American for a certain
> contingent liability of Booth American.

(*Id*., Ex. W ¶ 1.)  With respect to the second goal, the Redemption Agreement

_____

[2]It appears from the evidence that even if Ralph instructed Defendants to
replace the perpetual clause with a specific termination date, he did so because the
JLB Owners demanded a set end date to the escrow arrangement.  (BAC's Resp.,
Ex. 9 at 76.)

provides:

> The JLB Owners shall, effective as of the Closing, severally
> indemnify in the form as specified in Exhibit C [the Indemnification
> Agreement], and in the proportions specified in Exhibit D, and hold
> Booth American harmless from and against fifty percent (50%) of all
> amounts Booth American actually pays in respect of its contingent
> liability for any underfunded amount in the Booth American Company
> Pension Plan (the "Funding Obligation").  The security for this
> indemnity shall be the collateral as provided in Exhibit C.

(*Id*. ¶ 4, additional emphasis removed).  The Redemption Agreement contemplated

the parties' later termination of the Pension Plan and payment of whatever

shortfalls would be required if changes in underlying market conditions or

applicable funding formulas cause the amount of the underfunding to materially

decrease.  (*Id*. ¶ 14.)

The Redemption Agreement does not contain a termination date.  (*Id*.)  It

does contain the following integration clause:

> This Agreement and the transfer documents contemplated by this
> Agreement constitute the entire agreement and understanding between
> the parties hereto with respect to the subject matter hereof, supersede
> any prior negotiations, agreements, understandings or arrangements
> between the parties hereto with respect to the subject matter hereof
> and encompass all rights, claims and obligations between the parties.
> Other than as specifically provided in this Agreement and the transfer
> documents, the JLB Owners shall have no further rights as
> shareholders of Booth American.

(*Id*. ¶ 19.)

The Indemnification Agreement contains the following "Recitals":

A.   The JLB Owners previously owned fifty percent (50%) of the outstanding shares of Booth American.

B.   Contemporaneously with this Agreement, Booth American has redeemed all of the shares in Booth American owned by the JLB Owners pursuant to a Redemption Agreement dated as of January 7, 2006 (the "Redemption Agreement").

C.   Booth American has a certain contingent liability for underfunded amounts in a defined benefit plan (the "Funding Obligation"). This Funding Obligation may or may not result in Booth American having to make payments into this defined benefit plan. Furthermore, should payments be required under the Funding Obligation by Booth American, these payments may arise in the current or any future taxable year.

D.   The JLB Owners are entering this Agreement because, while the Funding Obligation is an obligation of Booth American, the JLB Owners are to be ultimately liable for fifty percent (50%) of the Funding Obligation.

(Defs.' Mot., Ex. V at 1.) The parties then agreed that the JLB Owners would be obligated to immediately indemnify and reimburse BAC, upon written notice from BAC, for half of any and all payments BAC made to the Pension Plan. (*Id*. § 1.) The parties further agreed that the JLB Owners' obligation would be secured by collateral held in escrow by Comerica Bank. (*Id*. § 2.) Upon BAC's written request for indemnification, the escrow agent would release the amount owed by the JLB Owners to BAC. (*Id*. § 3.) The Indemnification Agreement contemplated

-8-

that the amount held in escrow would be maintained to equal fifty percent of

BAC's liability to the Pension Plan, as determined by an annual report filed by

BAC on or before October 31, through the pledge of additional security by the JLB

Owners or the return of a portion of the security to them.  (*Id*.)  Central to the

current lawsuit and a state court action between the JLB Owners and BAC is the

following termination clause in the Indemnification Agreement:

> This Agreement shall terminate on December 31, 2011 unless either
> extended by the mutual agreement of Booth American and the JLB
> Owners or terminated at an earlier date by the mutual agreement of
> Booth America and the JLB Owners.  The termination of this
> Agreement shall not release or otherwise affect any rights or
> obligations of any party hereto which may have arisen prior to the
> date of such termination.  If there is no outstanding request for
> payment of 50% of the Funding Obligation as of December 31, 2011,
> the remaining Cash Security and other Security shall be thereafter
> distributed proportionally to the JLB Owners as quickly as possible
> thereafter.

(*Id*. § 6.)

Subsequent to the redemption, BAC made payments to fund the Pension

Plan and then sent a request to the JLB Owners for reimbursement.  (*See, e.g.*,

BAC's Resp., Ex. 18.)  Contrary to the parties' expectations, as a result of the

general economic downturn beginning in Fall 2008, the underfunded amount of the

Pension Plan steadily climbed and the $4.2 million liability which existed when the

transaction documents were negotiated and executed grew to approximately $7.0

million by 2011.  (BAC's Resp. Br. at Pg ID 571.)  BAC made funding requests to the JLB Owners in 2011, which were paid.  On January 12, 2012, BAC made an additional request for $60,000.00, which the JLB Owners refused to pay through a letter from their attorney, citing the termination of the Indemnification Agreement effective December 31, 2011.  (*Id.*, Ex. 20.)

According to Ralph, prior to receiving the JLB Owners' refusal, BAC never thought that the JLB Owners could walk away from their share of the Pension Plan liability.  (BAC's Resp., Ex. A at 138.)  BAC immediately contacted Defendant Soskin.  (*Id.* at 135-36.)  In a February 28, 2012 email to BAC, Defendant Soskin wrote, in part:

> . . . The removal of the pension liability from the value calculation was based upon treating the liability as a separate, contingent liability for which John would have a continuing 50% funding obligation. . . . This approach was done for John's individual benefit with the intention always being that the redemption amount received by the JLB [O]wners would ultimately be 50% of the value of the company, after factoring in the pension liability.

(*Id.* Ex. 1.)

On February 14, 2012, the JLB Owners filed an action in Wayne County Circuit Court against BAC, Ralph, and U.S. Bank National Association (where the escrow funds were then held), seeking a declaration that: (1) the JLB Owners' duty to fund the Pension Plan terminated December 31, 2011; (2) they were entitled to

-10-

the release of the collateral held in escrow; and (3) they had no further indemnity obligations with respect to the Pension Plan after December 31, 2011. (Defs.' Mot., Ex. CC.)  The JLB Owners subsequently filed a motion for summary disposition, in which they argued that the Indemnification Agreement was unambiguous regarding the termination of their indemnity obligation on December 31, 2011. (*Id*., Ex. DD.)

On August 16, 2012, following a motion hearing, Wayne County Circuit Court Judge Daniel P. Ryan entered a two paragraph, one page order, granting summary disposition to the JLB Owners.  (*Id*., Ex. JJ.)  Judge Ryan wrote that he found the Redemption Agreement and Indemnification Agreement to be integrated and that the JLB Owners' liability expired on December 31, 2011.  (*Id*.)  Judge Ryan entered a final judgment on December 11, 2012.  (BAC's Resp., Ex. 22.)

In the meantime, Defendants had entered into a tolling agreement with Ralph and BAC, effective June 15, 2012, tolling the statute of limitations until June 30, 2013 on any and all claims that Ralph and/or BAC may have against Defendants in connection with Defendants' legal services.  (*Id*., Ex. 2.)  On February 28, 2013, BAC filed the pending action against Defendants in Wayne County Circuit Court. Defendants removed the action to federal court on March 28, 2013, asserting

-11-

diversity jurisdiction.[3]

As indicated, Defendants filed a motion for summary judgment on February

10, 2014.  Defendants raise two issues in support of their motion:

(1)     Whether BAC is collaterally estopped from arguing that
        Defendants' negligent drafting or advice proximately caused it
        to execute the transaction documents, where a state court has
        found the documents unambiguous.

(2)     Whether BAC's malpractice claim is barred by the applicable
        statute of limitations.

Defendants filed a supplemental brief in support of their motion on April 25, 2014,

in which they raise a third basis for dismissing BAC's claim.  (ECF No. 28.)

Specifically, Defendants contend that BAC lacks the necessary expert evidence to

prove its legal malpractice claim.

---

[3]BAC is a Michigan corporation with its principal place of business in
Detroit, Michigan.  (*See* Compl. ¶ 1; Notice of Removal ¶ 10.) Defendant BME is a
limited liability partnership whose citizenship is based on the citizenship of its
partners.  *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 672 (6th Cir. 2004).
BME's partners are citizens of Indiana or Maryland.  (Notice of Removal ¶ 11.)
BAC seeks damages of $622,187.50 in the Complaint, representing the attorney's
fees, costs, and expenses of defending the JLB Owners' declaratory judgment
action and fifty percent of the funding obligations it paid to the Pension Plan
through the fourth quarter of 2012.  (Compl. ¶ 30.)  BAC also seeks damages equal
to fifty percent of its future funding obligations (which was alleged to be $7
million at the time of the filing of BAC's Complaint).  (*Id*. ¶ 31.)

## III.   Applicable Law & Analysis

### A.      Statute of Limitations Issue

Under Michigan law, a legal malpractice action must be filed "within two years of the attorney's last day of service, or within six months of when the plaintiff discovered, or should have discovered the claim[,]" whichever date is later. *Gebhardt v. O'Rourke*, 510 N.W.2d 900, 902 (Mich. 1994) (citing Mich. Comp. Laws §§ 600.5805, .5838); *Wright v. Rinaldo*, 761 N.W.2d 114, 116 (Mich. Ct. App. 2008). In *Gebhardt*, the Michigan Supreme Court reiterated that the six-month limitations period begins to run, not when "the plaintiff knows of a 'likely' cause of action", but when the plaintiff learns that he or she "has a 'possible' cause of action." *Id.* at 904 (citing *Moll v. Abbott Labs.*, 506 N.W.2d 816 (Mich. 1993)). The Michigan courts have held that an attorney's last day of service is when the " 'lawyer discontinues serving a client upon completion of a specific legal service that the lawyer was retained to perform.' " *Bauer v. Ferriby & Houston, PC*, 599 N.W.2d 493, 495 (Mich. Ct. App. 1999) (quoting *Maddox v. Burlingame*, 517 N.W.2d 816 (Mich. Ct. App. 1994)). Thus the Michigan Court of Appeals has held that the services of an attorney retained to represent a client in a divorce action ended when the divorce judgment was entered, even though the attorney handled various post-judgment matters for the client concerning visitation and child support

-13-

disputes related to the divorce agreement. *Miller v. Kinney, Cook & Linderfield*, No. 191941, 1997 WL 33352793 (Apr. 11, 1997) (unpublished).

Because they were retained by BAC to negotiate and draft agreements relating to BAC's redemption of the JLB Owners' stock, Defendants take the position that their services ended in mid-2006 when the transaction documents were drafted and executed. BAC responds that Defendants performed services related to the transaction documents from January 17, 2012 through March 6, 2012, and billed BAC over $13,000 for those services. Defendants' services during this time period related to the JLB Owners' position that their indemnification obligation terminated at the end of 2011. These subsequent activities are similar to the post-judgment activities handled by the attorney in *Miller*. Because this lawsuit arises from Defendants' services connected with the negotiation and drafting of the transaction documents, the Court agrees with Defendants that the two-year limitations period began to run in mid-2006 and expired well before this lawsuit was filed.

Defendants contend that the statute of limitations for purposes of the discovery rule started to run when the Indemnification Agreement containing the December 31, 2011 termination date was finalized and executed. In support of their contention, Defendants cite *Estate of Spry v. Batey*, 804 N.E.2d 250 (Ind. Ct.

-14-

App. 2004), and *K73 Corporation v. Stancatti*, 435 N.W.2d 433 (Mich. Ct. App. 1988). Defendants further argue that, because the Indemnification Agreement has been held to contain a clear and unambiguous termination date, BAC should have known when the agreement was executed that it was losing the right to indemnity from the JLB Owners after December 31, 2011. BAC takes the position that the six-month limitations period did not begin to run until January 13, 2012, when the JLB Owners first claimed that they were relieved of their obligation to indemnify BAC for the Pension Plan liability.

In *Estate of Espry*, the attorneys being sued had represented the estate of Kelly Spry who was killed in an automobile accident after she and the driver of the automobile left a tavern. 804 N.E.2d at 251. The estate entered into a settlement agreement with the driver's insurance company which contained a release of liability clause that released the driver "and *any other person, firm or corporation charged or chargeable with responsibility or liability* . . . from any and all claims, demands, damages . . . and causes of action on account of all personal injury . . . or damages of any kind already sustained or that I/we may hereafter sustain in consequence of [the] accident . . ." *Id*. (emphasis added). When the estate subsequently filed suit against the tavern, the tavern's attorney sent a letter to the estate's new counsel, which the latter received on June 1, 2000, demanding that the

-15-

estate dismiss the lawsuit because the general release in the settlement agreement between the estate and the driver's insurer also released the estate's claims against the tavern. *Id.* The estate pursued the lawsuit, but the state court granted the tavern's motion for summary judgment based on the release on November 13, 2000.

On September 5, 2002, the estate brought a malpractice action against the attorneys who represented it with respect to the settlement agreement. The Indiana state trial court granted summary judgment to the attorneys, finding that the state's two-year limitations period began to run when the tavern's attorneys sent their letter demanding dismissal based on the language of the release. *Id.* at 252. The Indiana Court of Appeals affirmed, concluding that "the injury and damage were ascertainable at least in June 2000" based on the letter. *Id.* at 254. The date in the present matter most akin to the accrual date in *Estate of Spry* is not the date the transaction documents were executed, but rather January 13, 2012– i.e., the date BAC received a letter from the JLB Owners' attorney, stating that the JLB Owners refused to indemnify BAC for payments to the Pension Plan made after the alleged December 31, 2011 termination date.

In *K73 Corporation*, the corporation hired an attorney to represent it in the sale of its dry cleaning business. *Id.* at 434. As part of the sale, the corporation did

-16-

not obtain security from the purchaser, only an unsecured promissory note.  The purchaser subsequently filed for bankruptcy leaving the corporation as an unsecured creditor.  Almost a year after the purchaser filed for bankruptcy, the corporation sued its attorney for malpractice.  *Id.*

The state trial court held that the corporation's action was time-barred.  *Id.* The Michigan Court of Appeals affirmed, concluding that the corporation knew or should have known that it was damaged by the attorney's alleged malpractice when the purchaser filed a bankruptcy petition that listed the corporation as one of its twenty largest unsecured creditors.  *Id.* at 435.  The court reiterated that "[i]t is the fact of identifiable and appreciable loss, and not the finality of monetary damages, that gives birth to the cause of action."  *Id.* (citation omitted).  The date in the present matter most akin to the filing of the purchaser's bankruptcy petition in *K73 Corporation* is the date BAC received the letter from the JLB Owner's counsel refusing BAC's request for indemnification.  The date the Indemnification Agreement was signed more closely resembles the date of the transaction pursuant to which the corporation sold its dry cleaning business to the purchaser without obtaining security, and there is no suggestion that the Michigan Court of Appeals considered this date as the discovery date for purposes of the six-month limitations period.

-17-

The Court therefore finds that BAC did not or should not have known of an injury arising from Defendants' alleged malpractice based simply on the execution of the Indemnification Agreement containing a December 31, 2011 termination date. Notably, in mid-2006, it was not at all evident that there would be an outstanding Pension Plan obligation by the termination date for which BAC would expect indemnification from the JLB Owners (and the Indemnification Agreement in fact reflects that the parties anticipated otherwise). The Court finds January 13, 2012 to be the earliest date BAC knew or should have known of an identifiable and appreciable loss arising from Defendants' alleged misconduct. Before six months from that date lapsed, the parties entered into the tolling agreement which tolled the limitations period through June 30, 2013. BAC filed the present lawsuit before that date.

For these reasons, the Court holds that BAC timely filed its legal malpractice action.

**B.      Collateral Estoppel Issue**

Defendants contend that BAC is estopped from alleging that Defendants' malpractice proximately caused its injury because Ralph Booth and Laura Petterle– "college-educated, sophisticated business people" (Defs.' Br. in Supp. of Mot. at 5)– read the Indemnification Agreement and should be presumed to have

-18-

understood the agreement's unambiguous terms providing for a December 31, 2011 termination of the JLB Owner's indemnification liability.  In other words, Defendants argue that under the doctrine of collateral estoppel, Judge Ryan's finding that the Indemnification Agreement terminated on December 31, 2011, bars BAC from now claiming that the agreement it ratified and accepted did not express BAC's intent.  Defendants' argument rests on the well-established rule that a party who signs a contract cannot later claim that he did not read it or believed it provided different terms, *see, e.g.*, *Farm Bureau Mutual Insurance Co. of Michigan v. Nikkel*, 596 N.W.2d 915 (1999), and the application of this rule in legal malpractice actions alleging the negligent drafting of documents.  (Defs.' Br. in Supp. of Mot. at Pg ID 114-17.)  Defendants specifically cite to the following decisions illustrating this rule: *Viking Corp. v. Van Dyke*, No. 290063, 2011 WL 1262143 (Mich. Ct. App. Apr. 5, 2011) (unpublished); *Avolio v. Hogan*, No. 287684, 2009 WL 3757437 (Mich. Ct. App. Nov. 10, 2009) (unpublished); *Schwarz v. Shapiro*, 608 N.Y.S.2d 210 (N.Y. App. Div. 1994); and *Berman v. Rubin*, 227 S.E.2d 802 (Ga. Ct. App. 1976).

In its decisions– including the cases cited by Defendants– the Michigan Court of Appeals has set forth the elements of an attorney malpractice claim as: "(1) the existence of the attorney-client relationship; (2) the acts which are alleged

-19-

to have constituted the negligence; (3) that the negligence was the proximate cause of the injury and; (4) the fact and extent of the injury alleged." *See, e.g., Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 436 N.W.2d 70, 77-78 (Mich. Ct. App. 1989) ("*Stockler*"); *Viking Corp.*, 2011 WL 1262143, at 2.  Although oft-repeated, the third element, as the *Stockler* court recognized, is misstated, as the attorney's negligence need only be *a* proximate cause of the client's injury. *Stockler*, 436 N.W.2d at 77-78 (explaining that "the language '*the* proximate cause' in element three should be '*a* proximate cause[.]' "); *see also Ignotov v. Reiter*, 390 N.W.2d 614, 617 (Mich. 1986) (Boyle, J., concurring) (pointing out that the court of appeals "clearly erred" when it required the plaintiff to prove that the defendant's negligence was "*the* proximate cause of his injury" and citing cases to show that "[i]t is well-established that in Michigan the burden is on the plaintiff to establish only that the defendant's negligence is *a* proximate cause of the plaintiff's damages.") (emphasis in original).

    In the cases cited by Defendants, the plaintiff's legal malpractice claim arose from the drafting of an agreement and/or advice provided with respect to the agreement.  The court held that the plaintiff failed to satisfy the proximate cause element of a malpractice claim because the plaintiff had read the agreement and therefore was presumed to have known and understood the agreement's terms.

In *Viking*, the plaintiff previously was sued for patent infringement by the Central Sprinkler Company ("Central") and was represented by the attorney-defendants. 2011 WL 1262143, at *1. Assisted by the attorney-defendants, the plaintiff reached a settlement agreement with Central pursuant to which the plaintiff was granted a license to *inter alia* use products that fell within the scope of the claims of certain patents. *Id*. Central's parent corporation, Tyco International Limited ("Tyco"), subsequently initiated a patent infringement suit against the plaintiff based on two different patents, which led to a settlement agreement between the plaintiff and Tyco. *Id*. The plaintiff then sued the attorney-defendants, maintaining that it believed Central and Tyco were the same entity during the suit brought by Central and intended for the settlement of that litigation to cover Tyco and all corporations under Tyco's umbrella. *Id*. at *2.

The Michigan Court of Appeals affirmed the grant of summary disposition to the defendant-attorneys, agreeing with them "that because [the] plaintiff signed the 2005 agreement [with Central], it should be presumed to know and understand the nature of the document– especially the fact that Tyco was not a party to the agreement and Tyco would not be bound by it." *Id*. at *3. The court additionally relied on the lack of any evidence suggesting that the attorney-defendants advised the plaintiff otherwise. *Id*. To the contrary, the plaintiff's vice-president of

-21-

marketing development confirmed that counsel never told the plaintiff that Tyco would be bound by the agreement and the evidence reflected that Central "flatly rejected a draft [of the agreement] including Central and its parents . . .." *Id*.

Likewise in *Avolio*, the Michigan Court of Appeals held that the plaintiffs could not prevail on a legal malpractice claim brought against their attorneys for failing to explain what the court found to be unambiguous settlement terms in an agreement the plaintiffs executed. 2009 WL 3757437. In litigation between the plaintiffs and a third party, the third party's attorney sent the plaintiffs' attorney a letter in which the third party offered *inter alia* to pay the plaintiff approximately $130,000. *Id*. at *1. No settlement or payments comporting with the proposal followed, the plaintiff's attorney retired, and a new attorney took over the plaintiff's representation. *Id*. at *2. The parties subsequently reached an agreement to settle the matter for $50,000, and the agreement provided for the plaintiff to release the third party from any claims regarding the subject matter. *Id*. After the plaintiff lost subsequent litigation against the third party to recover the earlier promised $130,000, she sued her attorneys for legal malpractice. *Id*. at *2-3. The trial court granted summary disposition to the defendant-attorneys, finding that the release in the agreement between the plaintiff and third-party "so clearly stated that it covered all claims that [the] plaintiffs needed no legal advice to

understand that aspect of it." *Id*. at *3. The court of appeals affirmed, concluding that "[b]ecause [the] plaintiffs now stand legally charged with having agreed to unambiguous terms releasing all claims, we reject the argument that [their attorneys] committed malpractice for failing to explain any of those terms." *Id*. at *4.

Similar reasoning supported the New York appellate court's decision in *Schwarz*, although the court's brief opinion offers minimal factual background except to indicate that the plaintiff was a sophisticated businessmen, that the party with whom he contracted insisted on certain additional benefits, and that the plaintiff consented to the agreement knowing the benefits which were to be accorded. 608 N.Y.S.2d at 211. The Georgia Court of Appeals' decision in *Berman* contains a more complete recitation of the relevant facts; however, those facts make clear that the terms of the agreement at issue (as in *Viking Corporation*, *Avolio*, and *Schwarz*) were plain, obvious, and required no legal explanation. 227 S.E.2d 802.

The legal malpractice action in *Berman* arose from a property settlement agreement which the defendant-attorney negotiated on behalf of the plaintiff in the latter's divorce. *Id*. at 804. The agreement set forth the plaintiff's obligation to pay a specified amount of child support and alimony based on his current earnings,

-23-

and provided that those amounts would increase by a certain percentage if his earnings increased in any one year.  *Id.*  When the plaintiff was found in contempt for subsequently failing to pay the increased amounts, he sued his divorce attorney for malpractice.  *Id.*

The Georgia Court of Appeals affirmed the trial court's grant of summary judgment to the attorney.  The appellate court relied on its finding that the property settlement agreement was neither ambiguous, technical, nor "laced with legal jargon" and the rule that "when the document's meaning is plain, obvious, and requires no legal explanation, and the client is well educated, laboring under no disability, and has had the opportunity to read what he signed, no action for professional malpractice based on counsel's alleged misrepresentation of the document will lie."  227 S.E.2d at 806.  The court made it clear, however, that "[its] decision should not be read to state or imply that an attorney may not be held responsible for his negligent draftsmanship whenever the client can or does read the document."  *Id.*  The court explained that "where the document requires substantive or procedural knowledge, is ambiguous, or is of uncertain application, the attorney may well be liable for negligence, notwithstanding the fact that his client read what was drafted."  *Id.*

In response to Defendants' motion, BAC cites one case where the court held

-24-

that the plaintiffs' legal malpractice claim was not barred by their reading of an

agreement which was later found to contain clear and unambiguous terms: *Alper v.*

*Altheimer & Gray*, No. 97C1200, 2002 WL 31133287 (N.D. Ill. Sept. 26, 2002)

(unpublished). *Alper* arose from the plaintiffs' retention of the attorney-defendants

to negotiate and draft transaction documents whereby the plaintiffs sold their

corporation. *Id*. at *1. After the sale closed, the plaintiffs discovered that the

purchaser had bought more of their business than the plaintiffs claimed they

intended to sell and hired valued employees the plaintiffs hoped to employ in their

own continuing business. *Id*. In subsequent litigation with the purchaser, the court

held that the terms of the transaction agreement were clear and that, as

sophisticated business persons assisted by counsel, the plaintiffs could not

reasonably have assumed that the agreement would result in anything other than

what occurred. *Id*. at *21.

The attorney-defendants cited cases, including *Berman*, to argue that this

finding collaterally estopped the plaintiffs from prevailing on their legal

malpractice claim. The court rejected their argument, finding the issue decided in

the earlier litigation with the purchaser distinct from the issue presented in the legal

malpractice action:

While Judge Lindberg [the judge who presided over the litigation

> between the purchaser and seller] did refer to the "plain terms" and
> "explicit carve-out provisions" of the agreement, his opinion also
> specifically notes the role that counsel played in assisting the Alpers
> to interpret and make assumptions about the stock purchase
> agreement.  Put differently, the issue resolve by Judge Lindberg–
> whether the Alpers *with assistance of counsel* reasonably relied on the
> representations of their adversaries in the face of the written contract–
> ultimately departs from the issue that Defendants emphasize– whether
> the written contract was itself so intrinsically clear and unambiguous
> that Plaintiffs could not have relied on their attorneys' duty of care.

*Id*. at *36.  The court explained that, regardless of what the agreement

unambiguously was held to state, the attorney-defendants could be found to have

engaged in malpractice by drafting transaction documents that failed to reflect the

plaintiffs' desired intent:

> It is not yet clear as a matter of law that the transaction documents
> Altheimer [the attorney-defendants] negotiated on the Alpers' behalf
> can be reconciled with what Altheimer admits it knew: namely, that
> the Alpers intended to engage in a post-closing diverting business
> [i.e., the portion of the business that they did not intend to sell] with
> Avers and Freeman [the employees hired by the purchaser] as
> employees.  A jury might reasonably conclude that even on its own
> version of the facts, Altheimer should have drafted the Non-Compete
> Agreement to prevent DTS [the purchaser] from hiring Avers and
> Freeman.

*Id*. at *37.  The court also reasoned in rejecting the attorney-defendants' estoppel

argument that the plaintiffs' misunderstanding about what was being sold may

have been caused or exacerbated by information that they received from their

counsel.  *Id*.

-26-

The district court's decision in *Alper* is particularly instructive in the present matter. Judge Ryan interpreted the transaction documents as establishing a December 31, 2011 termination of the JLB Owners' duty to indemnify BAC with respect to the Pension Plan obligation. BAC may be collaterally estopped from arguing that this is not the intent reflected in those documents. It does not follow, however, that this was BAC's actual intent (or even the JLB Owners' intent *at the time the transaction document were executed*) and that Defendants did not breach their duty to BAC by failing to draft documents that reflected BAC's intent. Otherwise an attorney could never be found liable for malpractice based on the drafting of a document which on its face appears to be unambiguous.

Here, the undisputed evidence reflects that *all* parties to the redemption agreed that the assets and liabilities of BAC would be divided equally between Ralph and related trusts, on one hand, and John and related trusts, on the other hand. The evidence also shows that this goal was communicated to and understood by Defendants. The undisputed evidence also reflects that the liabilities included BAC's obligation to the Pension Plan (and that this in fact was BAC's most significant liability) and that throughout the negotiations, the JLB Owners never disputed that they "*ultimately*" would be required to contribute half of the amount

-27-

owed to the Pension Plan.[4]  Based on Judge Ryan's decision, however, the

Indemnification Agreement was not drafted to accomplish this.

As reflected in the testimony of Ralph Booth and Laura Petterle at their

depositions, BAC understood, based on Defendant Soskin's statements and/or

advice, that the termination date did not cut-off the JLB Owners' ultimate liability

for the Pension Plan obligation.  While Ralph and Petterle may not have recalled

exactly what Defendant Soskin told them in this regard, the Court finds from their

testimony that both individuals' understanding was based at least in part on

communications and advice they received from Defendant Soskin.  While

Defendant Soskin now denies representing the agreement in this way to BAC, the

Court finds a genuine issue of material fact with regard to what advice he actually

---

[4]These findings are further supported by the fact that the only time more than
the nominal payment to the Pension Plan was made during the term of the
Indemnification Agreement, it was made at *John's* request.  (Defs.' Mot., Ex. A at
130-31.)  If the JLB Owners believed that their obligation to contribute to the
Pension Plan liability absolutely terminated on December 13, 2011, it seems
unlikely that they would ask BAC to pay anything more than the minimum
required while they remained obligated to indemnify BAC.  Further, Defendants
argue that BAC did nothing to protect its interests before the Indemnification
Agreement expired and they point the Court to Petterle's deposition testimony that
she put the transaction documents in a filing cabinet after they were executed and
did not look at them again before December 31, 2011.  (Defs.' Br. in Supp. of Mot.
at 8-9.)  Yet the Court finds it surprising that "college-educated, sophisticated
business people" (*see id*. at 5) would neglect the need for action before December
31, 2011, *unless* they understood that their was no need for action by that date.

provided, including any explanations he gave as to what the termination date meant for purposes of the JLB Owners' future liability.  Moreover, the transaction documents may have required substantive or procedural knowledge beyond the kin of laymen, regardless of their sophistication and education.

The present matter therefore is distinguishable from *Viking Corporation*, where the court found that the attorney never advised the plaintiff that Tyco was bound by the agreement.  2011 WL 1262143, at *2.  It also is distinguishable from *Schwarz*, where the court found that the party with whom the plaintiff contracted insisted on certain additional benefits and that the plaintiff entered into the agreement knowing that those benefits were being accorded.  608 N.Y.S.2d at 211.  Finally, it is distinguishable from *Avolio* and *Berman* based on the complexity of the agreement at issue here and because there was no evidence in those cases that the plaintiffs were advised and/or understood that the agreements reflected an intent contrary to their own.

The Court therefore rejects Defendants' collateral estoppel argument as a basis for granting summary judgment in their favor.

### C.    Expert Opinion Issue

In their supplemental brief, Defendants assert that BAC lacks expert evidence to prove causation and that this is an additional ground for granting

summary judgment in their favor.  Specifically, Defendants contend that, at his

deposition, BAC's expert on causation, Bruce Haffey, disclaimed all but one of the

opinions in his expert report and acknowledged that this remaining opinion was

based on speculative facts.  In that opinion, Haffey stated that Defendants should

have included an automatic "settle up" mechanism within the termination clause of

the Indemnification Agreement.  However, according to Defendants, Haffey agreed

at his deposition that he was only speculating that the JLB Owners would have

agreed to an automatic settle up mechanism such as the one he proposed.

As Defendants indicate, in *Stockler*, the Michigan Court of Appeals stated

that "[i]n a malpractice action, expert testimony is usually required to establish a

standard of conduct, breach of that standard of conduct, and causation."  436

N.W.2d 70, 87 (Mich. Ct. App. 1989) (citing *Thomas v. McPherson Cmty. Health

Ctr.*, 400 N.W.2d 629 (1986).  However, the court further indicated that expert

testimony is not needed "[w]here the absence of professional care is so manifest

that within the common knowledge and experience of an ordinary layman it can be

said that the defendant was careless[.]"  *Id*. (citation omitted).  In fact, expert

testimony was found to not be necessary in *Stockler*.  *Id*. at 88.

BAC may need expert testimony to explain to a jury how Defendants

breached their standard of care; however, expert testimony is not needed to prove

-30-

that their breach caused BAC's alleged injuries. An ordinary layperson easily could discern that BAC lost its right to recover the JLB Owners' fifty percent contribution to the Pension Plan obligation as a result of Defendants' alleged breach– the drafting of an agreement that absolutely terminated the JLB Owners' indemnification liability on December 31, 2011. Moreover, while Haffey may have been unaware of evidence indicating that the JLB Owners would have agreed to a formulation of the Indemnification Agreement that required them to contribute half of the liability as it stood on December 31, 2011, such evidence exists in the record. As set forth previously, throughout the negotiations for the redemption, it always was accepted that the JLB Owners shared the assets *and liabilities* of BAC with Ralph and the trusts associated with him and that those assets and liabilities ultimately would be divided *equally*. *See supra*.

The Court therefore concludes that Defendants' expert evidence argument also does not provide a basis for granting summary judgment in their favor.

## IV.   Conclusion

For the reasons stated above, the Court holds that BAC's legal malpractice action against Defendants is neither time-barred nor precluded by the doctrine of collateral estoppel. Further, assuming BAC lacks expert evidence on causation, the Court concludes that this does not negate its ability to prove its claim.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is

**DENIED**.

S/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 12, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, September 12, 2014, by electronic and/or U.S. First Class mail.

S/ Richard Loury
Case Manager